IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>$21,500.00 UNITED STATES CURRENCY,<br><br>Defendant. | Civil No. 8:25CV174<br><br>**COMPLAINT FOR FORFEITURE *IN REM*** |

The United States of America, for its cause of action against the Defendant property, pursuant to Rule G(2) of the Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions, states and alleges as follows:

### Nature of the Action

1. This is an action to forfeit property to the United States for violations of 21 U.S.C. § 881.

### The Defendant *in rem*

2. Defendant property is $21,500.00 United States Currency seized by law enforcement during a traffic stop on I-80 Eastbound near mile marker 382 in Milford, Nebraska on October 14, 2024.

3. The United States Marshals Service currently has custody of the Defendant's property.

### Jurisdiction and Venue

4. This Court has subject matter jurisdiction for an action commenced by the United States pursuant to 28 U.S.C. § 1345, and for an action for forfeiture pursuant to 28 U.S.C. § 1355(a). This Court also has jurisdiction over this particular action pursuant to 21 U.S.C. § 881.

5. This Court has *in rem* jurisdiction over the Defendant property pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district.

## Basis for the Forfeiture

7. Defendant property, $21,500.00 United States Currency, is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it constitutes 1) money, negotiable instruments, securities and other things of value furnished or intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act, 2) proceeds traceable to such an exchange, and/or 3) money, negotiable instruments and securities used and intended to be used to facilitate a violation of the Controlled Substances Act.

## Facts

8. On Monday, October 14th, 2024, Seward County Sheriff's Office ("SCSO") Deputy Michael Mejstrik ("Dep. Mejstrik") was working in his official capacity and operating a marked patrol vehicle.

9. At approximately 10:47 a.m., Dep. Mejstrik was traveling eastbound on Interstate 80 near mile marker 380.

10. At or about this time, Dep. Mejstrik observed a Chrysler Voyager ("Chrysler") bearing Texas license plates following another vehicle too closely in violation of Neb. Rev. Stat. § 60-6, 140.

11. In particular, Dep. Mejstrik timed the Chrysler traveling approximately .84 seconds

behind the vehicle in front of it in violation of Nebraska state law.

12. In light of the traffic violation, Dep. Mejstrik initiated a traffic stop of the Chrysler near mile marker 382 in Milford, Nebraska.

13. Dep. Mejstrik made contact with the driver, Rebekah N. Jones ("Rebekah") and explained the reason for the stop.

14. Also located in the Chrysler were four passengers later identified as: Tayja J. Balogh ("Tayja"), Marquise D. Hendricks ("Marquise"), Alvin A. Jones ("Alvin"), and Nikki L.D. Kenny ("Nikki").

15. Rebekah provided Dep. Mejstrik with her Michigan driver's license that identified herself as Rebekah Jones.

16. Dep. Mejstrik observed that Rebekah appeared to be very nervous and that her hand shook when she handed him her license.

17. Dep. Mejstrik requested Rebekah to exit the vehicle and to have a seat in the front passenger seat of his patrol vehicle while being issued a warning for the traffic violation.

18. Dep. Mejstrik provided Seward Dispatch with Rebekah's information for a records check.

19. While Dep. Mejstrik prepared a written warning, he conversed with Rebekah who asserted she was on her way back to Michigan from Tulsa, Arizona where she had spent 2 days with the group of friends that were traveling with her.

20. Dep. Mejstrik noticed that Rebekah responded quickly and confidently to questions about where she was returning to, but when asked where she was coming from, Rebekah hesitated and sounded unsure when she replied, "Tulsa, Arizona."

21. Based on his training and experience, Dep. Mejstrik found Rebekah's responses to be suspicious.

22. The Chrysler was registered to EAN Holdings, LLC (a vehicle rental corporation d/b/a National Car Rental and Alamo Rent-A-Car) and was rented out of Muskegon, Michigan by Rebekah per the rental agreement.

23. Based on his training and experience, Dep. Mejstrik knows that individuals involved in criminal activity to include *inter alia* trafficking illegal controlled substances and/or large amounts of currency will utilize a rental vehicle to evade law enforcement detection as well as potential forfeiture of a personal vehicle.

24. Dep. Mejstrik observed License Plate Reader ("LPR") data that showed the Chrysler made a turnaround trip from southern California, spending approximately 1 day in California.

25. Based on his training and experience, Dep. Mejstrik was aware that Rebekah was traveling between major source and destination areas for large amount of contraband.

26. Based on his training and experience, Dep. Mejstrik found Rebekah's travel plans to be illogical and indicative of drug trafficking. Specifically, it was illogical for someone to rent a vehicle to travel halfway across the country only to return roughly 36 hours later.

27. After completing the traffic stop, Dep. Mejstrik attempted to issue a written warning to Rebekah for following too closely in violation of Nebraska traffic laws but his printer was malfunctioning at the time.

28. Subsequently, Dep. Mejstrik issued Rebekah a verbal warning for the traffic infraction.

29. Dep Mejstrik informed Rebekah that the traffic stop was finished and then began a

consensual conversation with her.

30. Dep. Mejstrik confronted Rebekah about traveling to California which she denied.

31. Dep. Mejstrik asked Rebekah if there was anything illegal in the Chrysler which she denied.

32. Dep. Mejstrik asked Rebekah consent to search the Chrysler which she denied.

33. Based on the totality of the circumstances and his training and experience, Dep. Mejstrik had reasonable suspicion to conduct a canine sniff.

34. Dep. Mejstrik therefore deployed his certified narcotics detector K-9, Storm, around the Chrysler.

35. Dep. Mejstrik's K-9 alerted and indicated to the presence of a narcotic odor coming from the Chrysler.

36. Consequently, Dep. Mejstrik had probable cause to search the Chrysler.

37. Prior to searching the Chrysler, Dep. Mejstrik approached the vehicle and asked the passengers to step out of the vehicle.

38. As the passengers were exiting, Dep. Mejstrik asked where they were coming from and was advised "Las Vegas."

39. Dep. Mejstrik then searched the Chrysler and located *inter alia*: several used syringes throughout the passenger compartment; a small amount of marijuana; a locked money bag which was found in the trunk of the vehicle; and a black plastic bag containing a large amount of cash located in one of the suitcases.

40. SCSO Deputy Cody Bailey ("Dep. Bailey") arrived on scene to assist.

41. Marquise provided the key to the locked money bag.

42. The locked money bag contained $20,000.00 in loosely packed United States currency.

43. The black plastic bag contained $21,500.00 in loosely packed United States currency.

44. No identification was located near either of the bags of currency.

45. Law enforcement conversed with the passengers of the Chrysler.

46. Nikki advised Dep. Mejstrik that they were coming from Vegas where they had spent 2 days.

47. Nikki further advised the reason for their travel was to bring someone out to Las Vegas.

48. Nikki denied ever going to Arizona or California.

49. Marquise claimed the locked money bag belonged to him and his girlfriend, Tayja.

50. Marquise claimed there was approximately $20,000.00 in the bag and that they were going to use that money to buy a burgundy Dodge Challenger in Nevada.

51. Marquise further explained they did not buy the Dodge Challenger because the front-end had problems and therefore they were going back another time.

52. Tayja advised that Marquise was her boyfriend.

53. She further stated that the money in their bag was for shopping.

54. Alvin claimed ownership of the black plastic bag that was located in the suitcase and which contained $21,500.00 United States currency.

55. Marquise did not claim ownership of this bag or the $21,500.00 United States currency contained within it.

56. Alvin asserted that money was for gambling in Las Vegas at the casino—specifically at "the Flamingo and all that."

57. Alvin admitted to Dep. Mejstrik that he went to Long Beach, California to visit his

cousin.

58. Rebekah, Tayja, Marquise, and Alvin were transported to the Seward County Sheriff's Task Force office.

59. Nikki, who had stated earlier that he was a heroin user, was transported to a hospital via ambulance as he was having withdrawals and visibly declining in health.

60. Before being transported to the SCSO Task Force office, Alvin was found to be in possession of 10 purple M30 morphine pills.

61. Alvin could not provide a prescription for these pills.

62. Law enforcement seized the $20,000.00 found in the locked bag and the $21,500.00 located in the black plastic bag for a total of $41,500.00 in United States currency.

63. At approximately 1452 hours, Dep. Bailey conducted a blind discretionary canine sniff of the $41,500.00 in seized currency utilizing a certified narcotic detecting K-9.

64. In particular, Dep. Bailey utilized 2 blank clean boxes and 1 box containing the seized currency for the K-9 to conduct the sniff.

65. Dep. Bailey's trained K-9 indicated to the odor of narcotics on the box containing the seized currency.

66. All occupants of the rental car were released pending further investigation.

67. Background on the occupants of the rental car was performed and it revealed that Marquise and Alvin both had extensive drug criminal histories.

68. Marquise has a drug criminal history ranging from 2009 to 2016 with multiple convictions for felony-controlled substance delivery and manufacture of cocaine, heroin, or another narcotic, and controlled substance possession.

69. Alvin has a drug criminal history ranging from 1997 to 2006 with multiple convictions for felony-controlled substance delivery and manufacture of cocaine, heroin, or another narcotic, controlled substance possession, and controlled substance-inducing a minor to commit a felony.

70. Alvin is also currently on parole until March 14, 2027.

## Claim for Relief

WHEREFORE the United States of America prays the Defendant property be proceeded against for forfeiture in accordance with the laws, regulations and rules of this Court; that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed; that the Defendant property be condemned, as forfeited, to the United States of America and disposed of according to law and regulations; that the costs of this action be assessed against the Defendant property; and for such other and further relief as this Court may deem just and equitable.

UNITED STATES OF AMERICA,
Plaintiff

MATTHEW R. MOLSEN
Acting United States Attorney

By:   s/ Kimberly C. Bunjer
KIMBERLY C. BUNJER, #20962
Assistant U.S. Attorney
1620 Dodge Street, Suite 1400
Omaha, NE   68102-1506
Tel: (402) 661-3700
Fax: (402) 345-5724
E-mail:   kim.bunjer@usdoj.gov

And

By: s/ Mikala Purdy-Steenholdt
MIKALA PURDY-STEENHOLDT
(NY#5112289)
Assistant U.S. Attorney
1620 Dodge Street, Suite 1400
Omaha, NE  68102-1506
Tel: (402) 661-3700
Fax: (402) 345-5724
E-mail: Mikala.Purdy-Steenholdt@usdoj.gov